UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PASKENTA BAND OF NOMLAKI INDIANS; and PASKENTA ENTERPRISES CORPORATION,<br><br>Plaintiffs,<br><br>v.<br><br>INES CROSBY; JOHN CROSBY; LESLIE LOHSE; LARRY LOHSE; TED PATA; JUAN PATA; CHRIS PATA; SHERRY MYERS; FRANK JAMES; UMPQUA BANK; UMPQUA HOLDINGS CORPORATION; CORNERSTONE COMMUNITY BANK; CORNERSTONE COMMUNITY BANCORP; JEFFERY FINCK; GARTH MOORE; GARTH MOORE INSURANCE AND FINANCIAL SERVICES, INC.; ASSOCIATED PENSION CONSULTANTS, INC.; THE PATRIOT GOLD & SILVER EXCHANGE, INC.; GDK CONSULTING LLC; and GREG KESNER,<br><br>Defendants. | No. 2:15-cv-00538-MCE-CMK<br><br>**MEMORANDUM AND ORDER** |

Defendants Cornerstone Bank; its President and CEO, Jeffrey Finck; and its holding company, Cornerstone Bancorp (collectively, the "Cornerstone Defendants"), have moved for summary judgment on the claims made against them. ECF Nos. 289–

1

91. For the reasons set forth below, the Cornerstone Defendants' motions are GRANTED. Furthermore, because the disposition of their Motions for Summary Judgment disposes of all claims against them, the Cornerstone Defendants' Motion for Judgment on the Pleadings, ECF No. 311, is DENIED as moot.[1]

## BACKGROUND[2]

Plaintiff Paskenta Band of Nomlaki Indians (the "Tribe") employed Ines Crosby, John Crosby, Leslie Lohse, and Larry Lohse (collectively, the "Employee Defendants") in executive positions for more than a decade. Plaintiffs allege that the Employee Defendants used their positions to embezzle millions of dollars from the Tribe and its principal business entity, the Paskenta Enterprises Corporation ("PEC"). Plaintiffs allege the Employee Defendants stole this money from Plaintiffs' bank accounts—including ones at Cornerstone Bank—by withdrawing large sums for their personal use. Plaintiffs allege the Employee Defendants kept their activities hidden from Plaintiffs by such means as harassment, intimidation, and cyber-attacks on the Tribe's computers.

Plaintiffs further allege the Cornerstone Defendants knowingly assisted the Employee Defendants in aspects of their scheme. Plaintiffs allege the Cornerstone Defendants controlled banks where Plaintiffs maintained accounts and, despite knowing the Employee Defendants were withdrawing money from these accounts for their personal benefit, permitted the Employee Defendants to make withdrawals and failed to notify Plaintiffs of the Employee Defendants' actions.

Plaintiffs base these allegations in part on the Cornerstone Defendants' actions after the Employee Defendants' scheme was uncovered and the Employee Defendants were ousted from the Tribal Council. The Cornerstone Defendants "threatened" to

---

[1] Having determined that oral argument would not be of material assistance, the Court ordered the motions submitted on the briefs in accordance with Local Rule 230(g).

[2] Unless otherwise noted, the allegations in this section are drawn directly, and in some cases verbatim, from the allegations of Plaintiffs' Complaint.

interplead the Tribe's funds pending resolution of the leadership dispute that resulted from the Employee Defendants' ouster. Pls.' Opp'n to Mot. for Summ. J., ECF No. 304, at 3–4. This would have frozen the Tribe's funds and effectively halted all of the Tribe's gaming and business endeavors. Id.

On April 18, 2014, the Tribe and the Cornerstone Defendants entered into an agreement (the "April Agreement") whereby the Cornerstone Defendants would forgo the right to interplead the funds in exchange for indemnification should the new Tribal Council be found to have unlawfully taken power. Defs.' Statement of Undisputed Facts ("SUF"), ECF No. 289-2, ¶ 15. On April 28, 2014, Finck delivered a set of the Tribe's account records, and suggested that the Tribe look closely at the activity in one particular account. In that account, the Tribe ultimately found much of the Employee Defendants' embezzlement activity. On May 17, 2014, the Cornerstone Defendants again "threatened" to interplead the Tribe's accounts unless a new waiver was signed that indemnified the Cornerstone Defendants from any liability arising prior to the leadership dispute. Pls.' Opp'n to Mot. for Summ. J., at 6. This new waiver was signed on May 19, 2014 (the "May Agreement"). SUF, ¶ 40. The Cornerstone Defendants seek summary judgment on the basis of this waiver.

## STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment. See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each

3

1 claim or defense—on which summary judgment is sought."); Allstate Ins. Co. v. Madan,
2 889 F. Supp. 374, 378–79 (C.D. Cal. 1995). The standard that applies to a motion for
3 partial summary judgment is the same as that which applies to a motion for summary
4 judgment. See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances
5 Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment
6 standard to motion for summary adjudication).

7       In a summary judgment motion, the moving party always bears the initial
8 responsibility of informing the court of the basis for the motion and identifying the
9 portions in the record "which it believes demonstrate the absence of a genuine issue of
10 material fact." Celotex, 477 U.S. at 323. If the moving party meets its initial
11 responsibility, the burden then shifts to the opposing party to establish that a genuine
12 issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith
13 Radio Corp., 475 U.S. 574, 586–87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S.
14 253, 288–89 (1968).

15       In attempting to establish the existence or non-existence of a genuine factual
16 dispute, the party must support its assertion by "citing to particular parts of materials in
17 the record, including depositions, documents, electronically stored information,
18 affidavits[,] or declarations . . . or other materials; or showing that the materials cited do
19 not establish the absence or presence of a genuine dispute, or that an adverse party
20 cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The
21 opposing party must demonstrate that the fact in contention is material, i.e., a fact that
22 might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby,
23 Inc., 477 U.S. 242, 248, 251–52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and
24 Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also
25 demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is
26 such that a reasonable jury could return a verdict for the nonmoving party." Anderson,
27 477 U.S. at 248. In other words, the judge needs to answer the preliminary question
28 before the evidence is left to the jury of "not whether there is literally no evidence, but

whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. 87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

## ANALYSIS

Plaintiffs' opposition to the Cornerstone Defendants' MSJ is premised on the argument that economic duress rendered the May Agreement invalid. Under California law, economic duress requires "the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." Rich & Whillock, Inc. v. Ashton Dev., Inc., 157 Cal. App. 3d 1154, 1158 (1984). Plaintiffs allege that the Cornerstone Defendants' procurement of the May Agreement was a "wrongful act" because (1) they knew they had no right to interplead the Tribe's accounts; (2) that if they ever had a right to interplead the Tribe's accounts, that right was extinguished by the April Agreement, and thus, the May Agreement was pursued in bad faith; (3) that the waiver of claims based on past acts in

the May Agreement constituted "the wrongful exploitation of business exigencies to obtain disproportionate exchanges of value," and (4) the Cornerstone Defendants knowingly assisted the Employee Defendants in embezzling the Tribe's funds. Pls.' Opp'n to Mot. for Summ. J., at 10–20 (quoting Rich & Whillock, 157 Cal. App. 3d at 1159).

### A. The Right To Interplead The Tribe's Accounts

An interpleader action requires "a real and reasonable fear of exposure to double liability or the vexation of conflicting claims." Michelman v. Lincoln Nat'l Life Ins. Co., 685 F.3d 887, 894 (9th Cir. 2012). Plaintiffs argue that the Cornerstone Defendants had no right to interplead the Tribe's accounts because the ousted Tribal Council members did not have signing authority on the accounts, and the new Tribal Council sought to only "confirm" the authority of accounts' signatories. Pls.' Opp'n to Mot. for Summ. J., at 11. That is, Plaintiffs contend there was no risk of double liability as the individuals charged with authority over the accounts never changed or were split between the old and new Tribal Councils. Accordingly, they further contend that requiring Plaintiffs to provide indemnification in exchange for an agreement not to interplead the accounts constitutes a wrongful act.

Plaintiffs miss the forest for the trees. The broader dispute was over Tribal authority, not the identity of the specific individuals identified as signatories on the accounts. Both the new and old Tribal Councils claimed to be the legitimate Tribal Council. See SUF, ¶¶ 6–7.[3] Thus, both claimed to have authority over the accounts. For example, the new Tribal Council, exercising its authority as the supposed legitimate Tribal Council, added new signatories to the accounts. Id. ¶ 6. Accordingly, the Cornerstone Defendants had a real and reasonable fear of conflicting claims to the

---

[3] Plaintiffs claim that ¶ 7 of Defendants' Statement of Undisputed Facts is in dispute, objecting to Defendants' evidence as hearsay. Though Plaintiffs dispute the paragraph "in its entirety," their objection is narrowly based on a challenge to a single piece of evidence: a letter from the Bureau of Indian Affairs being used for the truth of its contents. Regardless of the propriety of the contents of the letter as evidence, Plaintiffs have failed to address the relevant fact: the old Tribal Council contended it was the legitimate Tribal Council and the Cornerstone Defendants knew of the tribal leadership dispute.

6

Tribe's funds based this dispute of authority and any "threat" to file an interpleader cannot be described as wrongful.  The undisputed evidence shows that the Cornerstone Defendants knew of the dispute over tribal leadership and that both the new and old Tribal Councils claimed authority over the accounts, regardless of who the accounts' signatories were at any particular point in time.

### B.     Pursuing Successive Agreements

Plaintiffs next argue that, if the April Agreement validly indemnified the Cornerstone Defendants in exchange for a promise not to interplead the Tribe's accounts, then the subsequent May Agreement was unnecessary and a wrongful attempt to obtain greater indemnification.  Pls.' Opp'n to Mot. for Summ. J., at 16–17.

However, the April Agreement was conditional, explicitly requiring the Tribe to hold a new election and reserving the right to file an interpleader should the results of that election be contested.  SUF, ¶ 26.  After the April Agreement was signed, the Tribal Court (under the authority of the old Tribal Council) filed a TRO against the Cornerstone Defendants, id. ¶ 32, and the old Tribal Council threatened to "take the Bank down," id. ¶ 35.  The only reasonable inference from these actions is that the old Tribal Council did not accept the May 10, 2014 meeting of the Tribe's General Council that elected the new Tribal Council—the election required by the April Agreement was contested. Accordingly, by the explicit terms of the April Agreement, the right to file an interpleader was revived, regardless of any waiver of such rights in the April Agreement.  Thus, the April Agreement's indemnification does not render the later May Agreement wrongfully obtained.

### C.     May Agreement's Indemnification For Past Acts

Plaintiffs then argue that the Cornerstone Defendants were aware of the economic pressure Plaintiffs would face if they filed an interpleader, and wrongfully took advantage of this pressure "to obtain disproportionate exchanges of value."  Pls.' Opp'n to Mot. for Summ. J., at 17 (quoting Rich & Whillock, 157 Cal. App. 3d at 1159).  That is, Plaintiffs contend the Cornerstone Defendants exploited the Tribe's need to maintain

access to their accounts to obtain indemnification for any past acts committed by the Cornerstone Defendants connected to the Employee Defendants' alleged embezzlement. Plaintiffs, however, provide no facts or show any issue of material fact that would support their conclusion.

Plaintiffs were represented by counsel during the negotiation of the May Agreement. SUF, ¶ 51; cf. Conoco Phillips Co. v. Milestone Pac. Props., LLC, 2010 WL 3619576, at *8 (N.D. Cal. Sept. 13 2010) (finding that "Defendants' after-the-fact assertion of 'economic duress' rings hollow" given their representation by counsel during contract negotiations). Plaintiffs provide no evidence that they objected to the broad indemnification or that they were not free to negotiate the terms of the agreement. Indeed, two different versions of the agreement were circulated between the parties. SUF, ¶ 52.

In fact, Plaintiffs' own evidence tends to show that if there was any pressure to refrain from negotiating, it came from Bruce Thomas, the CEO of the Tribe's casino. He managed to convince Cornerstone not to summarily file an interpleader and decided not to negotiate the original terms of the agreement because he "kn[ew] that we had to do whatever Cornerstone asked." Decl. of Bruce Thomas, ECF No. 304-11, at 9. No source of this "knowledge" is indicated except for Thomas's own assessment of the situation. Furthermore, instead of providing evidence that the Cornerstone Defendants were the source of the alleged undue pressure to accept the indemnification agreements, Plaintiffs only provide evidence that shows the pressure was of Plaintiffs' own creation. See, e.g., id. ¶ 10 ("When I [Bruce Thomas] provided the [April A]greement to Tribal Council members for their signature, I informed them . . . that we should not scuttle the deal over the language of the agreement. In other words, we could not ask for material changes to the agreement . . . ." (emphasis added))

Plaintiffs only provide vague declarations that "the Tribal Council determined that it had no choice but to agree to whatever Cornerstone was demanding in exchange for its agreement not to freeze the accounts of the Tribe and its business." Decl. of

Ambrosia Rico, ECF No. 304-5, ¶ 7.  Furthermore, their assertions that "Cornerstone was demanding we sign [the May Agreement] or it would freeze all of the accounts of the Tribe and its businesses," Decl. of Andrew Alejandre, ECF No. 304-12, ¶ 14, lack any kind of specificity that would create a genuine issue over the source of any pressure felt by the Tribe to accept the Cornerstone Defendants' agreements.  Plaintiffs do not say who presented the May Agreement to the Tribe, who demanded that it be signed, and provide no basis for the conclusory statement that "Cornerstone was demanding we sign it."  Decl. of Andrew Alejandre, ECF No. 304-12, ¶ 14.

Thus, Plaintiffs have not pointed to any facts that would create a genuine issue about whether the Cornerstone Defendants wrongfully exerted pressure on Plaintiffs to agree to indemnify the Cornerstone Defendants.  Accordingly, Plaintiffs' argument that the Cornerstone Defendants used economic pressure to obtain an exchange of disproportionate value is unavailing.

### D.  Knowing Assistance Of The Employee Defendants

Though Plaintiffs argue that the Cornerstone Defendants knew of and actively assisted the Employee Defendants' scheme, they provide no evidence to support such a claim.  The only evidence provided is (1) that Finck directed Plaintiffs to one of the Tribe's accounts that had particularly suspicious activity after the scheme was discovered, and (2) that John Crosby, one of the Employee Defendants, was a member of Cornerstone Bank's board of directors.  Pls.' Opp'n to Mot. for Summ. J., at 18–20.

First, that Finck indicated a potential problem account is not evidence that he knew of and actively assisted the Employee Defendants' scheme.  Plaintiffs essentially argue that Finck helped the Employee Defendants embezzle the Tribe's funds, subsequently help the Tribe discover that embezzlement, and then wait weeks before finally negotiating full indemnification.  Though all reasonable inferences must be made in favor of Plaintiffs as the nonmovants, the inferences that Plaintiffs ask the Court to draw are not reasonable.  At most, the only reasonable inference from Finck indicating a particular account that deserved increased scrutiny is that Finck at that moment knew it

contained suspicious activity. It does not support the inference that he knew the account contained suspicious activity before the Employee Defendants were accused of embezzlement or that he actively assisted the Employee Defendants in embezzling the Tribe's funds. The Court has previously found this inferential reasoning lacking when it assessed Plaintiffs' claims at the pleading stage. Mem. & Order, ECF No. 101, at 12 ("[T]he allegation that Finck alerted a Tribal employee to 'suspicious activity' does not plausibly allege he or any of the other Cornerstone Defendants had actual or constructive knowledge of the Employee Defendants' conversion . . . ."). The argument is no more availing at the summary judgment stage.

Second, the mere fact that Crosby was a member of Cornerstone Bank's board of directors does not impute his knowledge of the alleged embezzlement to the bank. Plaintiffs argue that Crosby's knowledge is imputed to Cornerstone because, as a member of the board of directors, he acted as Cornerstone's agent. Pls.' Opp'n to Mot. for Summ. J., at 19. However, "the rule imputing to the principal the knowledge of the agent rests upon the presumption that the agent will communicate his information, [and] the rule is inapplicable . . . where the agent . . . is acting in an adverse interest to that of his principal." Stueve Bros. Farms, LLC v. Berger Kahn, 222 Cal. App. 4th 303, 320 (2013) (quoting Witty v. Clinch, 207 Cal. 779, 782 (1929)). Using Cornerstone Bank to embezzle tribal funds is directly adverse to the interest of Cornerstone Bank; Crosby cannot seriously be expected to disclose embezzlement to the bank.

Thus, Plaintiffs have provided no facts that would support finding that the Cornerstone Defendants knew of or actively assisted the Employee Defendants' scheme.

## CONCLUSION

The May Agreement wholly indemnifies the Cornerstone Defendants from the causes of action Plaintiffs pursue against them. Plaintiffs have provided no evidence

that would defeat the validity of the agreement at the summary judgment stage of this litigation.  Though they argue the May Agreement was procured under economic duress, they have provided nothing but innuendo to support the notion the Cornerstone Defendants committed a wrongful act in procuring the agreement.  Accordingly, the Cornerstone Defendants' Motions for Summary Judgment, ECF Nos. 289–91, are GRANTED and their Motion for Judgment on the Pleadings, ECF No. 311, is DENIED as moot.

      IT IS SO ORDERED.

Dated:  January 24, 2017

<u>                                                                   </u>
MORRISON C. ENGLAND, JR
UNITED STATES DISTRICT JUDGE